Thank you for the break, and I think the system's fixed now. Great. All right. Can you hear us? One, two, three, four. Can you hear us? I can hear you. One, two, three, four. Is that the order right? The case of Cázares-Cobian v. Barr and Guerrero-López v. Barr are submitted, as is the case of Kielty v. Nation Star Mortgage. And we now turn to the case of Burnham v. Smith for argument. Good morning, Your Honors. May it please the Court, Daniel Inglés on behalf of the appellant Kenneth Burnham. I'd like to reserve about 6 minutes of time for rebuttal. Your Honors, the district court committed two separate and distinct errors of law in this case. First, with respect to Mr. Burnham's claim for excessive use of force, the district court took it as undisputed that Burnham had refused to hand the officers his shirt, which they claimed he was attempting to use as a ligature. The district court, based on that, ruled that it was reasonable for the officers to enter Burnham's cell, tackle him, and restrain him. Had the district court allowed the entire excessive use of force claim to be tried to the jury, the outcome could have been very different. And second, with respect to Mr. Burnham's deliberate indifference claim, Mr. Burnham presented a wealth of evidence at trial that the prison's food services administrator, Frank Jacobs, had witnessed a food services staffer named Carl Evans engaging in inappropriate sexual harassment and sexual abuse of inmates. Despite the similarity of this evidence to the evidence that was presented on summary judgment, the Court granted a Rule 50 motion in favor of Mr. Jacobs, apparently because the Court believed that Mr. Jacobs had not witnessed an Eighth Amendment violation, which is the incorrect standard, and that Mr. Burnham could show no more than negligence. This was also error. I'd like to begin by starting with the excessive use of force claim. As we know, the excessive use of force claim is governed by the Hudson factors. It looks at the extent of the injury, the need for force, the relationship between the need for force and the amount of force used, the threat perceived by the officers, and efforts to temper the severity of force. Now, the last four of these factors were all disputed on summary judgment. It's undisputed that Burnham did make some suicidal indication to a staff psychologist and that that staff psychologist then asked for help from correctional officers. However, Burnham claims that those officers began immediately yelling at him, screaming profanities at him upon arriving at the cell when Burnham had seated himself with his shirt in his lap. All of the officers testified that they had witnessed Burnham wrapping his shirt around his neck, but Burnham claimed that he had never done so. And most importantly, all of the officers testified that they had issued a direct order that Burnham hand his shirt over when, in fact, Burnham, in his affidavit in support of summary judgment, said he was never given an opportunity to do so. Counsel, if I could interject a question. Does he admit that he had the shirt in his lap? I believe he does, Your Honor. I believe he admits that he still certainly had access to the shirt and that he had control and possession. Does he admit that the shirt was tied in the form of a noose? No, Your Honor. He admits that he made some kind of an indication or a gesture. I don't believe that he ever admitted he actually tied the shirt or attempted to use it as a ligature. He also disputes, even though this cell was graded as not suicide resistant, he disputes that you could fit the shirt through what he referred to as the waffle grate in the record. And looking at the waffle grate, it certainly would have been reasonable for a jury to say, you know, if you look at this, you could not possibly take that T-shirt and tie it through that grate. And it's a cell. There's a picture of the cell in the record. And it's a cell no larger than a telephone booth. There's really not much harm that Burnham could have caused to himself and especially not to other inmates or to these officers. There were alternatives available that these officers simply chose not to engage with and address. You know, to believe Burnham's version of events, Burnham was nothing more than a difficult inmate. He did not pose a danger to himself or to others by the time that the officers arrived on the scene. And district courts in this circuit have held that when an inmate engages in back talk, especially when the inmate is already secured or restrained or is otherwise unable to pose a threat to the officers, there's at least a jury question as to whether the use of force is necessary. So here he wasn't in handcuffs, right? He was in a cell, but he wasn't really restrained additionally. Correct. And he does admit that he, whether he started the cursing or the officers did, they were engaged in at least a verbal fight. Yes, Your Honor. The record's unclear as to who said what and when. But that's what a trial would impart before is sussing that out. But I had trouble finding a case that said a prisoner who is not additionally restrained and is engaging in verbal assaults can't be further constrained with force. So I'm a little worried that, I mean, even if you have these fact disputes, that at least as to the qualified immunity issue, he may have trouble getting past the some use of force at the beginning of this incident. Sure, Your Honor. And I know that there are a couple of cases cited in the answering brief on that point. But they're eminently distinguishable. The respondents cite to the Cottle v. Steel case from the District of Idaho. But in that case, that was restraints on an inmate that posed longstanding, well-known suicidal concerns to the officers that were there. And that inmate had actually been placed on a suicide watch and had assaulted an officer, I believe during that suicide watch. But I think it's your burden to show that there is case law that clearly establishes that the officers knew, should have known, that an inmate who had allegedly just done something suicidal and now is yelling and isn't restrained can't be further restrained with force. I understand that, Your Honor. But I don't think qualified immunity demands a case that's precisely on all fours. I don't think this Court has ever required that. And I think it really comes from the Fourth Amendment context, where if there's no need for force at all, then any force used is unreasonable. And I think that when — if Burnham's version of events is to be believed, he doesn't pose a threat by the time the officers show up, and his renewed agitation is that the way he's being treated by the officers, it's no longer a suicidal ideation. He sort of — essentially, his claim is, if these officers had slowed their role and not been so intent on coming into my cell, restraining me, tackling me, and stripping me naked, they would have been able to calm down and see that I wasn't a threat to myself or others. It's really kind of that malicious — Counsel, Judge Gould, I think you've got a difficult argument, but you're making a persuasive presentation on it. From my perspective, it would help me if you would spend some time addressing the claim regarding the passive supervisor, Jacobs. Absolutely, Your Honor. And I think I've said everything I need to say on the excessive use of force claim, so I'll move to the deliberate indifference claim. Your Honors, as I already stated, the Court found that the evidence on summary judgment was sufficient to defeat — was sufficient to defeat Jacobs's motion for summary judgment. But that's in tension with its ruling on the Rule 50 motion. The evidence presented on summary judgment is staggeringly similar to what was presented at trial. There were five evidence that — five inmates that submitted affidavits on summary judgment. Three of them testified at trial, and the two who didn't, their testimony was basically cumulative. The inmates that testified at trial established a pattern that Jacobs did not stop Mr. Evans from being, quote, playful with inmates. He had an inmate that everybody referred to as his boyfriend. And most importantly, Burnham testified and other inmates corroborated that Evans had groped Burnham in his presence and had once touched Burnham's private parts with such force that it caused Burnham to drop a plate of food that he was holding. Despite this, during the Rule 50 colloquy, the Court seemed far more focused on whether Jacobs could have viewed the actual rape from his office. The rape took place in the warehouse, but Burnham never alleged that — that Jacobs witnessed the actual rape. And the Court also focused on whether Jacobs had actually observed an Eighth Amendment violation. So if we assume that the district court made a mistake here and the facts would have supported an Eighth Amendment violation, you still have to show that a Bivens remedy is available and that there's not qualified immunity. So it seems like, at least for my purposes, I'd be interested in those legal questions. Sure, Your Honor. With respect to qualified immunity, which I think is the simpler of the two questions, that goes to the Schwenk case from 2000 from this Court, which said that in the simplest and most absolute of terms, inmates have a right to be free from sexual harassment and sexual abuse. And if you pair the Schwenk case with the Wood v. Beauclair case, which said that even one instance of groping an inmate, depending on the circumstances, can constitute actionable sexual assault, I think any reasonable prison administrator, assuming all of Burnham's facts are true, that he did — that Jacobs did witness Evans touching inmates with force and that Jacobs knew that Evans had an inmate who was his boyfriend. So we definitely have case law about the need to protect from other prisoners. Right. Were any of these cases about a supervisor protecting from an employee? Your Honor, none of the case law that I've seen was about a supervisor protecting an inmate from an employee. But if you draw the analogy to the — to Carlson and its progeny, that's obviously protection from prison employees. It's not just protection from inmates that a deliberate indifference claim. If I'm understanding your question correctly. But usually — so I think, I mean, you can, like, sue the doctor who didn't give you the care, right? But this is a level above. This is the supervisor of the — right. But such a claim is still viable under Carlson. If there's deliberate indifference, I don't know if it matters who along the food chain. As long as you see the excessive risk to inmate health and safety and you draw the inference, that's deliberate indifference to inmate safety. And I understand that Respondent's claim that Ziegler v. Abassi forecloses this claim, but I can't see how it does. And in particular, when you look at this Court's decision in Lanuza v. Love, which was a falsification of evidence claim, and this Court allowed the falsification of evidence claim to go forward, despite the fact that there is none of the sort of triumvirate that was announced in Ziegler v. Abassi, none of those cases is on all fours with falsification of evidence. The Lanuza Court made it clear that it's about the individual officer's actions, and here I don't think this is just a — it's certainly not respondeat superior. And although it is supervisory liability, I think such a claim is very clearly permitted under Carlson and is the essence of Carlson, which is even if you are not the person who is the doctor operating on the inmate or the officer who is using force, Farmer v. Brennan remains good law, and that was about protecting an inmate from other inmates. Frankly — And that was a Bivens claim. And that was a Bivens claim. And I'm, frankly, a little confused as to why Farmer is not mentioned in Ziegler v. Abassi as another Bivens claim that the Supreme Court has signed off on. I think it would be an enormous step backwards for this Court to say that a Farmer-style claim is no longer valid. And if a Farmer-style claim remains valid, it's difficult to see how this sort of claim is not. If Jacobs had witnessed an excessive use of force incident, that he had every opportunity to stop and did not, I think that Farmer would be a good analog for that situation. So it seems like in this case you have a default judgment against Evans that will probably never be collectible. Not something I'm here to comment on, Your Honor. But do we need to think about in general the availability of a claim against the actual rapist employee as another remedy when we think about the supervisor, or do you think they're really separate? I think, A, I'd be interested to hear Respondent's view on that question. They seemed to take it as a given. They don't make a Ziegler v. Abassi argument as to excessive use of force. I think that if an excessive use of force claim remains valid under Ziegler, and that seems to be the agreement of the parties, it's hard to see how sexual assault by a prison official does not remain valid. And if sexual assault by a prison official remains valid, I know we're getting into layers here, but it's hard to see how a Carlston-style claim of deliberate indifference. Let me ask you about alternative remedies. It occurred to me this morning that perhaps you have an alternative remedy under the Federal Torts Claim Act case. Your Honor, that may be true. And obviously, I was not advising Burnham at the beginning of his case. I don't. And I'm not completely familiar with all the remedies that are available to inmates. However, if you look at the Carlston case, Carlston and the legislative history of the Federal Torts Claim Act make it clear that the FTCA was passed knowing that Bivens remedies existed and not intending to be a. . . The FTCA was passed in 1946. Sorry. The most recent amendment at the time of Carlston. I understand the FTCA is older than that. The Carlston court, I think, does a very good job of walking through why the FTCA does not provide an adequate remedy. And the Lanusa court talks about it a little bit. And so, too, has the Central District of California in the Moniham and McDaniels cases, which I think make very forceful and convincing arguments. And why does Carlston tell us that the FTCA does not apply? It's not that it doesn't apply, Your Honor. It's that the remedy afforded by the FTCA is incomplete and is intended to serve as a complement to a Bivens remedy. For one example, the FTCA, there's no right to a jury trial, whereas in a Bivens action there is. That's one of the differences. And I think the court also saw that the deterrent effect of declaring, you violated my constitutional rights, and being able to get that declaration in court is far different than being able to get a declaration of negligence. I see that my. . .    . . . . . . . . . . . . . I have some other questions. One of the things mentioned in that Supreme Court case was availability of determined remedies when we look at Bivens. My question is, what types of remedies are available under the administrative remedy program of the prison for a harm that has already happened? I understand they could maybe get injunctive relief, but are there any monetary damages, or is it just injunctive relief? Your Honor, to my knowledge, there are not. Was that your full question? I just want to know whether he could get, whether your client could get monetary relief through that program. I don't believe that monetary damages are available through the administrative remedies program. And something that the Respondent's brief talks about is the availability of injunctive relief and other sort of policy-shaping relief through the administrative remedies program. But I would again point this Court back to Lanuza, which says that, you know, a straightforward case against a low-level officer for past conduct really can't be addressed very well through that administrative remedies program. There are remedies available, but they fall far short of the complete remedy that's afforded by Bivens. I see that I have about 3 minutes left, and I'd like to reserve that time. Thank you. That's fine. Thank you. Good morning, and may it please the Court. Christina Morrison appearing on behalf of the appellees. I'd like to just start very briefly on the use of force issue and then move, use my remaining time to the failure to protect claim. To answer Judge Gould's question, Mr. Burnham actually testified that at the time the cell door was opening, he was standing and holding the shirt. He was not handcuffed. And with respect to whether or not an order was given, Fred Moreno testified that he heard, as did Frank Armenta, that he heard Officer Rico give an order to hand over the shirt. And Mr. Burnham himself testified that he did not recall what Rico said, but he recalls cussing back at Rico. He recalled what? Cussing or cursing back at Officer Rico. So in the light of that facts, Whitley v. Albers does control here. Deference should be given to the officers. They intervene to save his life, and they are entitled to qualified immunity. Turning to the failure to protect claim against Frank Jacobs, I'd like to start with the, what was clearly established, the law that was clearly established at the time of the alleged constitutional violation, which was the April 2012 rape. At that time, even if we assume that the alleged complaints and alleged activity that Jacob was present at was seen and heard, at most we are dealing with groping of the buttocks of an inmate on the outside of his clothing in multiple incidents. What about the grabbing of genitals so he drops a plate? That's more than that. It is groping from the groin area, yes, but as I will discuss, there's no testimony that Frank Jacobs actually saw the groping. The testimony is clear. He was talking to another inmate immediately before that, namely Adams, and that when the pan dropped, he turned and saw the pan drop and laughed. That can only establish presence. It does not establish perception. Why isn't that a question for the jury? They're not like in a giant banquet hall. You know, it's a kitchen. And why isn't it a fact question that he saw this? Because we have to look at what the testimony was. The testimony was that Mr. Jacobs was talking to another inmate immediately prior to the pan dropped, everybody turned and saw the pan and laughed. No inference can be drawn that he saw it, and no inference can be drawn that he actually inferred that this was an Eighth Amendment violation. What was clearly established at that time, the Watteson case, was issued in February 2012, right before the alleged rape. Watteson rejected the claim that physical contact with an inmate in a cell when that person was partially disrobed using the toilet, that did not rise to the level of an Eighth Amendment violation. More importantly, in Watteson, the Watteson court relied on an Eighth Circuit Court of Appeals decision called Berryhill, and went into some detail analyzing that case. And in Berryhill, it dealt with multiple instances of the unwanted groping of an inmate, particularly of inmates' buttocks, and noted that it would be a distortion to characterize that as sexual abuse. And this Watteson court agreed that it was not objectively serious to rise to the level of an Eighth Amendment violation. On that basis, the clearly established law was that even if there was evidence suggesting that groping was going on, that that constitutes an Eighth Amendment violation. Therefore, Mr. Jacobs is entitled to qualified immunity. And I would also note that Schwenk and Farmer dealt with instances of the rape, attempted rape or actual rape. That's what constitutes serious enough behavior to warrant a Bivens remedy. And because the conduct complained of does not rise to that level, qualified immunity is warranted here. I'd also like... Counsel, could I ask you the same question I asked your friend on the other side of the case? And that is, what type of remedies are available? So, the remedies... What would the administrative remedies look like? So, the administrative remedies are available. There's a grievance process. There are not monetary remedies available based on the Prison Litigation Reform Act and PREA. But Congress specifically decided that. And yes, FTCA is available. And in fact, Mr. Burnham, in his initial complaint, pled an FTCA complaint or allegation. Or at least he sued the United States. And that claim was dismissed without prejudice. And he failed to amend or further pursue that. But that is an alternative remedy available to him. Another critical reason why the granting of the Rule 50 motion was correct is because plaintiff did not provide sufficient evidence as to causation. He needs to have shown that Jacobs' acts or omissions were so closely related to the deprivation that Jacobs was the moving force that caused the deprivation. And we are talking about an April 2012 rape. Our position is that the record is devoid of any evidence to show that Frank Jacobs caused this. Specifically, Mr. Jacobs reported that had he known, had he actually drawn the inference, his responsibility in what he would do is report it to SIS, Special Investigative Services. And then he would be expected to sit on the sidelines while SIS handled that. John Feeney also testified. He was the head of the SIS division. And he went into great detail about the process that comes into play when there's a report. That it cannot automatically remove an employee from his position. That Frank Jacobs, there was no evidence in the record that Frank Jacobs could have automatically removed any employee or even transferred him from his position. And that they needed to take time to verify the reports, bring in the FBI. And based on- I'm having trouble understanding how this could be right, though. I mean, we have Farmer, which is a Bivens claim for not protecting a prisoner against sexual assault. I think our court actually has another case, Gillespie, that I don't think was mentioned in the briefs from 1980, that's also a Bivens case about not protecting a prisoner from sexual assault. It seems like if there's an Eighth Amendment obligation to protect prisoners from sexual assault, it can't be a defense that we've set up our administrative procedures to make it impossible to protect someone. I mean, that's up to the prison, right, whether they can move an employee or whether they can move a prisoner. I mean, if they have an obligation to protect, how can you say it takes months to do anything in our prison and so we don't have an obligation? So, obviously, with respect to a negligence claim, the institution, that could have been a question that was put forth. It wasn't pled in this case, but we're talking about Frank Jacobs. What was his responsibility? Nothing in the record supports a finding that he could have automatically removed Mr. Evans. And John Feeney testified he received a far more specific complaint that did state an Eighth Amendment violation, that Carl Evans was having sex with inmates in exchange for contraband. It took him three months before they could remove him from his position, and Carl Evans remained in the Food Service Department. But, I mean, that's the prison's fault. Like, I don't understand. It doesn't seem like you can just say, well, we make it impossible to transfer anyone, an employee or anyone. So, too bad, prisoners. You have no constitutional rights? That doesn't make sense. Respectfully, we have to focus on what it's not the prison's fault. The prison hasn't been dragged through this litigation. Frank Jacobs has. He did not have the authority to remove anybody from their position. John Feeney specifically testified he was expected to, once he was aware that an investigation was underway, to sit on the sidelines and let the entity that was responsible for investigating take its course. And during that time period ---- You're saying that Jacobs could not discipline Evans in any way? Jacobs could not have removed him. The only evidence in the record is that had he drawn an inference, had Jacobs known, was to report it to SIS. That is the only evidence in the record that's available. But, okay, so maybe that seems kind of incredible. But putting aside whether he knew that rape was going on, are you saying that when he's observing grabbing buttocks, he has no ability to move Jacobs to the paperwork instead of or, I mean, or Evans, I'm sorry, move Evans to doing paperwork instead of being there with the prisoners or do some kind of supervisory rearrangement? The only evidence in the record, and this was John Feeney and Frank Jacobs stated, was if he had, first of all, there's no testimony anywhere that he observed knew anybody was going to rape anybody. But with respect to groping, there's no, the only thing, his only thing is to report it to SIS because it's SIS's responsibility to handle those reports. Counsel, it may be that ultimately he can't get someone removed without reporting it to SIS, but is there any reason that he could not say to Evans, stop that, that's improper? Absolutely. And would this case be any different if Evans had been grabbing the buttocks of some woman inmate who was working in the kitchen? There would be no difference between the gender of an inmate in terms of the type of physical contact and if there's no peniological purpose. Would it have been different, there would have been different facts in the evidence of showing Frank Jacobs perceived something. And even if he said stop it, he still would have had the responsibility to report it to SIS. And that's what would have, failure to do that once you know and prevent that, that would somehow provide a link that he was a moving force that caused the deprivation. I find it hard to believe that a supervisor who advises an employee not to do something, the employee continues doing it, is powerless to do anything about it. Is that what you're telling me? I'm not, Your Honor. What I'm telling you is what his responsibility was, what he was limited to. I'm not talking about responsibility, I'm talking about power. His power was to report it. And that was it. The government's position is that a supervisor can do nothing about Evans other than to report it to the investigators, right? No, if he actually saw and perceived it, he should have said something. But saying something is useless because he doesn't have any power to remove Evans saying something. He does not. He does not have the authority. What your position is, the federal government's position is that a federal employee who's a supervisor and sees an employee acting badly can do one thing and one thing only, which is to report it to an investigator, period. Correct, particularly since there's union contracts that are involved and there's due process to that particular employee. So what if Jacobs saw Evans poisoning the food? I mean, literally, he's in a kitchen. What if he sees poisoning the food? Are you saying the only thing he can do is report it to an investigation that's going to take three months? Well, he should remove the poison, keep the poisoned food from going out as well. But in terms of what Carl Evans' status as an employee is, when there's union contracts and there's due process for that. Well, if he can remove the poison from the food, he can put himself in between Evans and Burnham and say, don't touch this man, but he can't do that, right? No, he could do that, and maybe I can segue to the next part of my argument, which is there is insufficient evidence to show he perceived anything. With respect to the behavior that was complained of, first of all, there was some testimony that there was groping going on out in the kitchen when Mr. Jacobs was in his office. That can establish presence, not perception, particularly since Mr. Burnham himself testified that when you're out on the floor, you cannot see in through the windows of the office. It's essentially a one-way view where staff can see out, but others can't see in. So that does not establish perception. But staff can see out. So, I mean, isn't there a fact dispute about whether he could see this? There isn't based on the testimony that was provided. So, for instance, in the February 2012 incident, Mr. Burnham claimed that Evans touched his lower thigh in a sexual manner, and when asked why that was sexual, he said because men don't typically touch other men there. We're in a federal prison, pat-downs occur, but even if that somehow could rise to the level of an Eighth Amendment violation, Burnham only testified that Jacobs was standing near and there was no response from Jacobs. Inferring that, even most favorably to the plaintiff, nothing suggests perception that Jacobs saw, and that's the second part of Farmer that's critical here. In order to hold him personally reliable for the sins of another person, he had to have known, he had to have seen, drawn the inference that there was a serious risk to Burnham. Mr. Burnham also testified again regarding the pan-dropping incident. But know it being he needs to realize there's a risk, but he doesn't need to see the rape. He just needs to know that there's a risk of the rape, right? Absolutely. But there has to be a risk based on behavior that rises to that level, and we've talked about what was clearly established at the time of April 2012. But if you're saying based on conduct that rises to that level, it sounds like you're begging the question again. I mean, are you saying he needs to have seen a rape to expect a rape? Not rape, but more than groping of the buttocks, we would submit. However, even if this Court disagrees with me, what was testified to was only presence, not perception. So again, for the thigh pat, Jacobs was, quote, standing near and gave no reaction. That doesn't, no one can infer he perceived anything. But how is that not a jury question? Because no one knows what he perceived other than him, but they can say, well, he was there, he was in a room with a window that he could see, he saw various things, he laughed. I mean, isn't that enough to create a jury question? It's not, because the plaintiff provided no evidence of perception. But how does anyone ever? I mean, yes, if he did respond, then we'd know, but that means that you get out of the violation by doing even less. I don't understand how that could be what creates a jury question or not. The evidence on the record is an absence of testimony from the plaintiff, and it was his burden. And Mr. Jacobs testifying, he never saw anything. He did not know. He did not perceive. There is no question of fact. If there had been testimony that Evans was speaking while this happened and Jacobs was nearby, Evans responded immediately afterwards. Jacobs said something. That shows perception. It's not, the question of fact that we seem to be coming back to is, was there facts indicating something was afoot? But that's only half a farmer. We need more. We need perception on the part of Jacobs. So why is it, counsel, that the perception issue isn't a fact issue that the jury should decide based on the totality of the circumstances? That is, what was happening then, what comments Jacobs made on other occasions about any similar conduct? So to be clear, Jacobs never made any comments about any sexual groping of the buttocks. We have nothing from Jacobs. We have no comments from Evans. The only thing we have are, again, presence, standing near, he didn't respond. With the pan dropping, we maintain, you know, we have to take what evidence would have gone to the jury. And if there's no testimony from any of the inmates that establishes or even hints that Jacobs perceived it, walking away when something's happening is not sufficient. You know, talking to another inmate and having your attention directed there and then having your attention drawn when a pan drops is not sufficient. It's scarce, if anything. And then the only other thing that we have is, you know, for instance, Mr. Burnham's verbal complaint with respect to walking into Mr. Jacobs' office, complaining about the hours of his apprenticeship program and indicating that he didn't come to food service to learn about the homosexual stuff or sexual harassment. And, again, we don't even have perception there. First of all, it doesn't mention a staff member, does not mention Evans at all or sexual abuse. And Mr. Burnham can't testify to Jacobs' perception because he turned and walked away before anything else and Mr. Burnham said, I didn't want to. So when you said there was no perception, you're not denying that he saw a grabbing of buttocks, are you? There is no evidence in the record that he actually saw a grabbing of the buttocks. So the testimony I'm looking at on page 583 to 584 of the ER is, I think, Burnham's testimony that Evans would grab Jersey's butt and Jacobs was present.  And what, if anything, did he do? And then he says he would just shake his head or say, cut it out. So when we get to the specific, I have 585 and 583, he was specifically asked what Jacobs did and he said Jacobs turned and walked away. Well, on page 584 he says, Jacobs would just shake his head or say, cut it out. And assuming that that, taking that as true for the purposes of the Rule 50 motion, I would refer back to what law was clearly established. At most we have an isolated incident of grabbing of the buttocks that does not rise to the level of an Eighth Amendment violation. As to the Abbasi argument... Could you take counsel back on the perception issue we're arguing? Why would Jacob say, cut it out, if he did not perceive the conduct? Again, our, and I see my time is almost out, if I may briefly respond. Sure. I would say that at most, if the, considering that most favorably, at most he saw an isolated instance of groping of the buttocks, which under Watteson and the analysis of the Berryhill is not sufficient to constitute an Eighth Amendment violation. Therefore, not fair notice for him to infer a serious risk of an Eighth Amendment violation. We ask that this Court affirm. Okay. Thank you very much, Ms. Morrison. Thank you. Your Honors, I have just a few comments in rebuttal with respect to the deliberate indifference claim. I think the use of force claim at this point, it seems like everything that's needed to be said has been said, so if there are no questions there. If this Court looks at the Farmer case, it's whether the supervisor knows of and disregards an excessive risk to inmate health and safety. And an inference from circumstances has always been permissible, it was permissible explicitly in Farmer, it remains permissible today. And the supervisor does not need to know of a risk that is particular to this inmate. The supervisor does not need to be able to predict with certainty the particular circumstances of the Eighth Amendment violation or even the dangerous condition that is going to befall the inmate. They just need to see an obvious substantial risk. And here we have testimony from these inmates, Adams testified that there were so many instances that he could not even begin to recount or estimate the number of times that something had happened with Evans. They all testified that this was a pervasive and just daily part of being on this food services shift. And perhaps most importantly, first of all, Judge Friedland, you're right that there is testimony that Jacobs told Evans to cut it out or knock it off, and that came from multiple inmates. And also there was evidence that he referred to another inmate as Evans' boyfriend or boy toy, that he used this effeminate nickname that the inmates had adopted for Evans. And I just think that the presence versus perception question, which I will also point out is not in Respondent's brief, is a red herring, that there was enough evidence, just as there was on summary judgment, that Jacobs was more than present, that he perceived the risk, that he drew the inference, and it should have gone to the jury. And can you respond to this argument that Jacobs had no ability to do anything about Evans? Your Honor, I find that argument curious because if Burnham had tried to sue somebody higher up the food chain than Jacobs, almost certainly the government's argument would be that Ziegler v. Abbasi doesn't allow that claim because now you're getting too far up the supervisory chain. And that's exactly the type of Bivens action that Ziegler, I think, is pointed at, these far-reaching, more policy type, somebody at the warden's office or higher up in prison administration should have done something. This was the guy who was on the line. He testified that he interacted with Evans every single day, and that's exactly like the government officials in Carlson who were fully apprised of a dangerous condition and chose not to do anything about it. I think that if the evidence on summary judgment was good enough to take us to a trial, then certainly the evidence at trial was good enough to go to the jury. And if there are no further questions, yes. I have one question on the Federal Torts Claim Act case. Apparently you did file a Federal Torts Claim Act case, and it was a motion to dismiss? I am not familiar with that particular part of the record, Your Honor.  And it wasn't — there was no amendment? You just withdrew it? Not that I'm aware of, but, frankly, I'm a little unfamiliar with the early proceedings of this case. I was just wondering why you withdrew it and didn't amend it. I couldn't comment on that, Your Honor. I wasn't Burnham's counsel at the time. But your position is that the FTCA is not an adequate remedy because there's no jury? Correct. My position is that the FTCA is intended to coexist with a Bivens remedy and that it's intended to diminish the power of a Bivens remedy through the FTCA and its amendments following the creation of a Bivens remedy. Thank you. Thank you. All right. Thank you, counsel, for a very interesting presentation. And the case of Burnham v. Smith is submitted for decision. And that ends our calendar for today. No, wait a minute. Yes, we've already done that. And our calendar for today will be in recess until tomorrow morning at 9.30. Thank you. All rise.
judges: Gould, Bea, Friedland